Case number 14-1138. Sierra Club de Puerto Rico et al. Petitioners v. Environmental Protection Agency and Genoma Parking. Mr. Ehlers for the petitioners, Mr. Doyle for the respondents, and Mr. Collins for intervening and responding. May it please the Court. My name is Christopher Ehlers. I represent petitioners Sierra Club de Puerto Rico, Ciudadanos en Defensa de la Humanidad, Majesdenego de Arecibo, and Comité de Asura Cerro Arecibo. Appearing with me today is Ashley Welch, under the student clinicals of this Court, although I will be delivering the oral argument. This is a challenge to an EPA rulemaking limiting the applicability of non-attainment new source review to facilities with potential to emit 100 tons per year of the non-attainment pollution only. Intervenor Energy Answers plans to construct a solid waste incinerator in Arecibo, Puerto Rico. Let me get to timeliness here. When, under your view, did this challenge to the rule ripen for your petitioners, for your clients? This challenge became ripe when there was final agency action on EPA's granting of an application for a permit under the Prevention of Significant Deterioration Program. That occurred on May 19, 2014, with publication of notice in the Federal Register. Why wasn't it ripe when there was a determination that had been approved by EPA that Puerto Rico was in non-attainment for lead? You're referring to the designation at the end of 2011. That would still have been speculative for petitioners, because there was no final agency action yet. There was final agency action with respect to whether Puerto Rico was going to be deemed in non-attainment and whether they would have to adopt a state implementation plan, right? Yes, there would have been final agency action if one were hypothetically to bring a challenge to the non-attainment designation. But in this case, we're dealing with the applicability of an EPA rule limiting the applicability of non-attainment news source review. That was in the original rule. I'm sorry, Judge? What you're contesting was there when the rule was promulgated. Yes, Judge. There's a lot of case law. I mean, you're relying on one case principally, and it just doesn't support when you compare it to the cases that say you have to file within 60 days of the promulgation of the rule. In this case, in the case that you're relying on, Coalition for Responsible Regulation, EPA promulgated a tailpipe rule, which was an after-effect event, which gave rise to a new time period. But there are a bunch of other cases, New York v. EPA, medical waste, ARB 2.1, ARB 2.2, that all say that if all you're doing is challenging the regulation as it was promulgated, the same claim that you're making now could have been advanced 60 days after the regulation was passed. And our case law is quite clear, and I went back through all these provisions in all of our cases. And our case law is quite clear that in this kind of a situation where all you're essentially doing is saying the regulation as promulgated is not consistent with what the statute requires, you're too late. Your Honor, we're relying on a longstanding doctrine of this Court, dating back at least to 1982 in the Baltimore gas and electric case, where the Court recognized that petitioners, after the 60-day period has lapsed, may bring challenges to regulations which become ripe only after that 60-day period. It was more recently applied in Coalition for Responsible Regulation. It was recently applied in New York v. Medical Waste, which is just the opposite of what you're saying. Well, we're relying on Coalition for Responsible Regulation. I understand. That was the tailpipe rule. That was the tailpipe. You had an after-regulation event that gave rise to a reason for you to challenge. I mean, we're taking – I realize the law in this area is strange, but that's why I went back and looked at all of our cases. And what they seem to stand for is if you're not challenging anything more than the regulation as it was originally promulgated, you're too late. And you can't come in and say, well, but now we're really concerned because the challenge is exactly the same. It is exactly the same that could have been raised 60 days – within 60 days. This concern that you're raising, which is very clear, but it was very clear when this regulation was promulgated many, many years ago. And that's the reason we have the rule. It's really kind of absurd to prepare a case where you're asking us to look back at the agency's reasons in its rulemaking so many years ago. It all seems so out of context and so – it makes no sense. You're supposed to raise those challenges at the time when the regulation was promulgated. That's why we have notice of parole's rulemaking. We have opportunity for people to challenge. You have a 60-day rule. You can come in and say what they did. It doesn't pass Chevron one or two. Yes, Your Honor, that is the general rule. Within 60 days, you have to bring your challenge. But if that was dispositive and if it was dispositive in Coalition for Responsible Regulation that EPA issued a new interpretation, that would supersede the court's tolling doctrine. The principle of the tolling doctrine is to allow petitioners to bring a challenge when a regulation becomes right. The policy underlying that case was to prevent speculative claims, claims that were not right, to avoid having to put the court through a lot of litigation about claims that may or may not happen in the future. And I think it is particularly telling – The problem there is you're alleging that the harm you suffer here is caused by the original rule. That's what you seek relief on. Right. And the rule is what it was, just as Judge Edwards suggested. And your case really proves the point against you. I mean, I was surprised that you were relying on it until I went back and looked at all the cases. And, of course, I saw why you – I mean, you didn't have anything else to rely on. And the problem is the case you're relying on, EPA – it was no longer speculative when EPA promulgated the tailpipe rule regulating greenhouse emissions. That was the after-the-fact event. The agency did something, changed the regulation effectively. And so now there could be a challenge. There is that line of case law that EPA has cited in its brief. No, this is your case. This is a case you're citing, and that's what the court says allowed you to file well after the 60 days of the original rule. There was an amendment to the rule. They changed it. They amplified it. In Coalition for Responsible Regulation, claims became ripe for petitioners who were subject to EPA's rules from the late 1970s and early 1980s for the first time. In our case, the final agency action and the grant of the PSD permit and telling the petitioners that nonattainment news source review did not apply because of this rule, that created the ripeness for our case. Ripeness depends on the particular context. But I guess I can take your argument to a point. But when I went back again and looked at Coalition for Responsible Regulation, the court there pointed out that the challenge was made within 60 days of the promulgation of the new rule. And so it seems that your best argument would be that this aspect of the rule didn't apply to Puerto Rico back in 1980 or during the 1990s or during the 2000s. But once Puerto Rico was designated as nonattainment for lead, then this rule applied to Puerto Rico. Then the regulation didn't apply to us. And therefore, we didn't have a challenge. But once it can apply to you, then it seems that under coalition, you have 60 days from that moment to file your petition. But you didn't file it within 60 days of the moment that the regulation began to apply to you. You filed it 60 days after a permit was finalized. Right. But EPA's conclusion that nonattainment new source review did not apply, being based on EPA's rule, that conclusion was asserted in responses to comments within that application for the PSD permit. So that was all bundled together with the PSD review being done by EPA. You are not challenging the permit per se here. If it's what causes your harm, then you should be challenging it and claiming timeliness and standing with reference to the permit. But you're challenging them. You're going all the way back to the problem against the original rule. Yes, Your Honor. And you're not – it's harder to see how you're timely and or have standing as to that. We're not challenging the PSD permit. The role of the PSD permit is to create the ripeness. The ripeness that EPA would have said would have been lacking if we had filed a suit before that, if we had filed a suit when the area was designated as a led nonattainment area. If we had filed a suit when someone had filed an application for a PSD permit, if we had filed a suit when EPA announced notice of a public comment, period, that would not have been final agency action. If we had filed an action then, EPA would have said that our claim is not ripe yet. So it was all bundled together under the same final action that involved the granting of the PSD permit. You cited a case in your brief from the Second Circuit, the Weiler v. Chatham Forest Products case. That was a case where residents sued, I guess, the operators who proposed to build a plant to build basically a particle board. And in that case, the Second Circuit said that that suit against the operator could be used at least on a motion to dismiss. They accepted the proposition that that could be used to challenge the regulation under which the state permit had been issued. Why didn't you do that here? We're challenging the regulation. The EPA rule is what creates the harm. EPA's rule creates an administrative... If it creates the harm, why didn't you have standing and ripeness within the 60 days after the promulgation of the rule? You seem to be meeting yourself coming back on this argument. If it creates harm, then there is a challenge to your standing, certainly the challenge of timeliness. And if the rule is what creates the harm, then why did you not have ripeness and standing at the time the rule was promulgated? Many of our petitioners simply did not exist either as organizations or as individuals, individuals who had not yet been born yet. But I mean, yes, that always lurks in these cases, but we've kind of shrugged our shoulders. Like, what can we do about that? So a rule 30 years from now, 50 years from now, someone can come in and say, but I wasn't here 50 years ago, and I really don't like that rule, and I think it's inconsistent with the statute, and I'm challenging it. Do we allow that? Of course not. The court allowed it in Baltimore Gas and Electric and Coalition for Responsible Regulation for Corporations. We do not believe there is any distinction in the case law. But how did we allow that in Coalition for Responsible Regulation? We didn't see that at all. The court held that the Association of Homebuilders and the Oilseed Producers Association could bring ripe claims to an EPA rule from 1980. Did we say anything about plaintiffs that had not been in existence or claimants that had not been in existence at the time of promulgation? Yes, Judge. Yes, Your Honor. What was important was that they had not been subject to the rule before. Did we say anything about whether their time of coming into existence had anything to do with right and understanding? It did not address that, no. Right. I've spent an awful lot of time on Coalition for, I mean, it's very important to remember all the verses I write. Yes, Judge. I would like to reserve time for rebuttal. It is particularly telling that the court was looking at page 45, Federal Register 52711. That contains the three mistakes that EPA made when it promulgated our final rule. I would like to address that at rebuttal. The rebuttal is for answering things that are said by the EPA. I'll give you a couple minutes. Why don't you make your argument there? This is a Chevron Step 1 case. The statute defines a major stationary source as one with potential emissions of 100 tons per year of any air pollutant. That applies to both PSD review and nonattainment resource review. EPA's rule limits the applicability of nonattainment resource review to only those facilities with 100 tons per year of emissions of the nonattainment pollutant only. Alabama Power vacated an administrative exemption very similar to this, where EPA had limited the applicability of best available control technology to only the pollutants for which there were emissions in major amounts. That case is very close to ours. We believe it's dispositive in this case. The rule should be vacated at Chevron Step 1. If I may reserve time for rebuttal. All right, thank you. We'll hear from the respondents. Thank you, Your Honors. May it please this honorable court, I'm Andrew Doyle with the Department of Justice. I'm joined today by Brian Doster and Elliot Zinnick of the Environmental Protection Agency. The petitioner's attack on this 35-year-old regulation is too late. It's too late under any conceivable construction of the Clean Air Act's judicial review provision. That's the thrust of our pending motion to dismiss, and that's quite rightly the focus of this oral argument. What is your view of when someone can rightfully claim after arising grounds to challenge a regulation? Does after arising grounds have to be a new event of consequence, new information that calls into question the old regulation you wish to attack? What if the regulation didn't apply? I mean, in 1980, could someone in Puerto Rico have standing to challenge the regulation when there wasn't this aspect of the regulation, when there wasn't even a non-attainment finding? Someone in Puerto Rico may not, but as Judge Edwards alluded to, Congress drew lines, and they had to rely on proxies of interest back at the time of the original promulgation. And here we can see through the comments in the rulemaking you had interested persons that thought the regulation went too far and others that thought it didn't go far enough. So as Judge Edwards noted, you're always going to have cases where people say, I wasn't around then, I didn't have standing then, but as long as there were proxies in interest, then it's quite rightly applied just as Judge Edwards has articulated. In the coalition case, what the courts there said was that the tailpipe rule had the effect of expanding the PSD program to never-regulated sources. So that is fully consistent with the proxies and interest I was talking about. Well, Puerto Rico was never regulated by this regulation, by this aspect of the regulation, until it was deemed in non-attainment. Well, even under that view, they're too late, because at the latest then it would be the 2011 decision by the EPA that Puerto Rico is in non-attainment for lead. And at that time, this source that is the subject of the permit had already filed its application, so they were proposing to build. So whether you go under what we think is the correct view, as Judge Edwards has articulated through the case law, or even if you assume arguendo that you have to wait until these particular petitioners had reason to challenge the regulation, they're too late. And what EPA did in May of 2012, which they call a non-final action, yes, it's non-final as to the prevention of significant deterioration permit, but it is just a statement of law by the EPA that lead does not require a non-attainment new source review permit because of its low amounts, and that will be dealt with by the state permitting authority. That was just a statement of law. That was the legal conclusion that follows a for sure from the designation of Puerto Rico as not or this part of Puerto Rico as non-attainment for lead. So that really answers the case right there. I mean, they are too late under any conceivable construction of this Act's provision. Your Honor, I cited the Second Circuit case. The petitioners rely on that for purposes of redressability in the standing analysis. I don't think the court needs to reach the standing question here. But if it does, I wanted to bring to the court's attention that there is a circuit split on that question. I don't believe this court has addressed the issue. Addressed what specific issue? What is there a split on? They cite this case, and the Second Circuit speaks to the proposition of whether the petitioners may bring suit under the citizen suit provision of the Act to argue against a source you're not getting your non-attainment new source review permit that you need, and you are prohibited from constructing until you get that. The question is how do you read that citizen suit? Do you read it to say that? Is that an issue even before us in this? If you don't reach the standing question, it is not before you. If you only... But since they're attacking the original rule rather than the permit, would it be before us anyway? That's correct. That's absolutely correct on the merits. That's absolutely correct, as well as the timeliness issue. Okay. The petitioners mentioned also on their merits argument their Chevron 1 argument. I just would underscore what we argued in our brief, and that is the case before the Supreme Court on review from coalition dealt with this squarely. And you cannot read that opinion and conclude and reach any other conclusion, but this is a Chevron 2 question for the EPA on the merits back in 1980 when they looked at this. The way that the Supreme Court, though, came to the conclusion that it was a Chevron 2 question was that they said that basically from the beginning, at least the way I read the opinion, from the beginning, EPA interpreted major emitting facility to mean different things in different contexts. And so that was, I think, a principal linchpin for the court's analysis. What's interesting about this statute is that major emitting facility and major stationary source appear in the same provision there with the same definition. Major emitting facility, that's the only definition that I see in the whole Clean Air Act for it. Major stationary source, though, has in, if I'm counting correctly, six different places within the statute been given other definitions where it says, well, in this context, major stationary source means this or that or the other thing. So Congress clearly knew how to give that phrase a different meaning when it wanted to. That's not the case with major emitting facility. So it seems to me it's difficult for me to understand how the agency, even if we get the Chevron 2, can justify saying that major stationary source doesn't really mean what the statute says that it means in that provision. Well, it's not, of course, the reading of the definition of major stationary source alone. You have to see the context in which it is used here. And back in 1980, the state of the Clean Air Act then was there was a construction moratorium. And in the construction moratorium, drastic measures had to be taken to stop these bigger sources from coming into nonattainment areas until the issue could be fixed. And so there was a linkage in statutory text between the facility where the emissions, they said emissions from the major stationary source that are causing the nonattainment. So it is that statutory text that gave the EPA the authority they needed to do the moratorium, not only to implement the moratorium, but to construe the permit requirements of the nonattainment new source review program to what kind of pollutants, the pollutants for which the area is designated nonattainment. Why does it follow that just because Congress said that there's going to be a temporary moratorium for certain types of facilities that that means that that's the way you interpret what facilities are going to require this type of a permit forever in the future? It's not the mere fact that Congress did it. It's what they wrote. And what they wrote was no major stationary source. This is on page 45 of our brief, shall be constructed or modified in any nonattainment area if the emissions from such facility will cause or contribute to concentration of any pollutant for which a standard is exceeded in such area. But why does that help you? Because they could have said that exact same thing in the provisions where they said what types of facilities need permits. They didn't use that language. If anything, that seems to hurt you, not help you. Well, at best, you can read it either way. But when you couple it together with the offset ruling where EPA explicitly tied nonattainment areas with nonattainment pollutants, you have Congress codifying it, that very offset ruling. It was law for at least two years of time. It was a statutory law for two years of time. And then Congress built on it with other provisions. But that's clearly a congressional endorsement of EPA's linkage of pollutants for the major stationary source in nonattainment areas with nonattainment pollutants. You also have other indications in the statute beginning on page 48 and 49 of our brief, linking pollutants in nonattainment areas with the reason why that area is designated nonattainment. I just don't think that that construction makes sense in the overall context of the statute. The reason that you have these special rules in nonattainment areas is that it says we're going to take an inventory. We're going to see how much of this pollutant that you're out of compliance with here in lead is being emitted from all the sources within that area. And then our goal is to reduce that because we want you to get attainment. We want you to gain attainment. Within five years is kind of the default, right? Right. How can you gain attainment if, in an instance like this, you approve a facility that's emitting more lead into the atmosphere than the facility that caused you to get out of attainment in the first place? How does that make any sense? You do it three ways. One, the major sources are required to get a permit, a major source permit. But don't forget there is the statutory obligation for the states and territories to make reasonable further progress and to regulate minor sources to come into attainment. So there are three different hooks to get to the attainment. And the argument the petitioners raised only deals with one of those hooks, the lowest achievable emission rate requirements and the offset requirements. But you still have requirements, and Puerto Rico has implemented those requirements here. But why would you interpret major source, then, given the focus that Congress has, where they kind of have this laser-like focus on the non-attainment pollutant, to say, well, major source means you've got to be major for that pollutant. So we don't really care about lead unless you are spewing out 100 tons per year of lead. Why does that make sense when you look at the overall scheme? Well, as EPA explained, they took first in the offset ruling, which again was codified by Congress, they took a resource look at that and said, we've got to take fast-sweeping measures, but we can't get to everybody right away. In this case, we're going to deal with the majors through the permit program, require the states to make reasonable further progress, and issue minor source permits for the non-major sources. And that's how we're going to do it. I don't see anything in the record explaining why, if you define major source the way the petitioners say it should be defined in this context, that it would be administratively unreasonable or burdensome. You don't have the record that you had in utility air. You don't have anything close to it. You don't even make that argument in your brief. We do in the context of the offset ruling. This is beginning on page 49 of our brief, through the balance. The offset ruling, EPA was explicit and gave a resource explanation for its construction of applying the major source permit requirement only to non-obtainment pollutants. It was very explicit there. And our point there is that you're correct in the sense that EPA did not say the same rationale when it promulgated the rule at issue, but because it did, in fact, invoke the offset ruling, that explanation is there by necessary implication, and the standard is whether the agency's path can reasonably be discerned. And we submit that's met here. Granted, you have to tie a few federal registers together to get there, but the standard is that each agency explanation is reasonably capable of being discerned. We believe that's the case. If the Court has no other further questions. All right, thank you. Thank you. We request that EPA's motion to dismiss be granted. All right, thank you. Thank you. May it please the Court, Brendan Collins for Energy Answers, Arecibo. Energy Answers agrees with everything that EPA presented in its brief and in Mr. Doyle's argument here today, but I'm not here to defend the pool. I'm here to talk about the permit that was issued by EPA to Energy Answers, Arecibo, for this facility in Puerto Rico, and which is sort of the subject of this appeal. In the petition for review, the petitioners sought review of three things. Number one, the prevention of significant deterioration permit issued by EPA. I'm just going to call that the EPA permit. I've only got three minutes. Two, the Environmental Appeals Board decision upholding that permit. And then three, the rule which has been the exclusive focus of the substantive arguments in this case in the brief. That's the only relief they pray, isn't it? The only relief they pray goes to the rule, right? Well, that is true in their brief, and that is true given what Mr. Ollers says, and so I'm here primarily to call the attention of the Court to that issue and to ensure that the Court recognizes that there is absolutely no information given, no reason given, no citation of the record into law, that would suggest that this Court should do anything other than deny the petition for review with respect to the permit and with respect to the Environmental Appeals Board decision upholding the permit. You say in your brief in a footnote that if they're challenging the Puerto Rico permit, which for all intents and purposes is a state permit, they would have to go through the state kind of APA administrative review process and then up through the Puerto Rico Supreme Court. That's correct, Your Honor. What would happen after that? After that, after the Puerto Rico Supreme Court rules, I believe that that would be the final authority on the issue of whether or not the Puerto Rico permit complies with the requirements of Puerto Rico law. And this is a case classically which demonstrates the operation of the Clean Air Act. EPA establishes a rule requiring state implementation plan requirements. The state adopts its own organic laws, or the Commonwealth adopts its own organic laws to implement that, pulls them up to EPA for approval as a state implementation plan. EPA approves and then the state goes and implements those laws. So you're saying that they couldn't bring in that a challenge to whether the state implementation plan actually should have been approved in the first place because it violates the federal statute. That's correct, Your Honor. The approval of Puerto Rico's state implementation plan is compliant with EPA's rules. It's an entirely different federal action. We cite to that, I believe it was in 1997, we cite to it in our brief, because it does EPA, I believe. So what is your position as to when and how that could be challenged? Well, my position, first of all, is that this is a challenge to the rule on its face for reasons that were not only could have been raised but, in fact, were raised in the comment process at the time as EPA has articulated. I will also say that the court should not be concerned that people in petitioner's situation here and elsewhere are just flat out of luck because there are procedures by which interested parties can, in fact, seek reconsideration of rules, even 35-year-old rules by EPA if new facts are presented to change EPA's mind. Is that a petition for rulemaking? Yes, sir, a petition for rulemaking or reconsideration of existing rules. So those procedures are available and those would be different avenues in. As a business, Energy Answers has to come to the law as it is. This project began really long before it began its permit applications in 2011. It assessed the law. It decided what was permissible. It made its investments and so forth. And it's inconceivable that 36 years later a rule that has been undisturbed for all my entire time of practice would be flipped over and require different things. And that demonstrates the wisdom of both Congress's decision in requiring timely appeals and of this court's jurisprudence in making sure that the window for after rising grounds is very, very narrow. I see my time is up. I thank you very much for your attention. Thank you. Your Honor, in response to the Department of Justice, our petitioners are just like the never-regulated sources in Coalition for Responsible Regulation. We were regulated when we were told that an administrative exemption from nonattainment new social view applied to us. A company is injured when a permit requirement is imposed. We're injured when the EPA applies an administrative exemption, which says that a permit requirement does not apply. Number two, the 1977 amendments, which created the permit requirement for nonattainment new social view, came after the offset ruling. The construction moratorium cited by EPA today and cited by EPA at 45 Federal Register 52,711 as the basis for its rule, was never limited to potential emissions in major amounts of nonattainment pollutants. It was limited to a major stationary source that is defined in Section 302 of the Clean Air Act as one with potential emissions of 100 tons per year of any air pollutant. The such language that EPA refers to today simply referred back to the statutory definition. The construction moratorium further said it applies to a major stationary source if it causes or contributes to concentrations of the nonattainment pollutant. That was not a numerical limitation on the amount of pollutants of the nonattainment pollutant. That would be admitted sufficient to trigger the requirement of a permit under this program. Number three, the language in the petition for review related to the Environmental Appeals Board, that picked up any references to the very issues that we brought before the Environmental Appeals Board. We've made it clear we're not asking for rescission of the PSD permit, so the arguments of energy answers are not material. I see my time is up. If I could just finish very briefly. All right, 30 more seconds. Finally, the equitable arguments simply are not material to this case. This is a Chevron challenge. The court need look no further than Chevron step one. The statute is clear. Potential emissions in major amounts of any air pollutant. That is the statutory trigger for PSD review. That is the statutory trigger for nonattainment and source review. EPA has created an administrative exemption which clearly violates the plain language, the text of the statute. My clients were injured when the permit was granted, when there was final agency action, when they were told that this administrative exemption applies and excused the obligation to obtain the permit. All right, thank you. Thank you, Your Honor. We'll take the case under advisory.
judges: Wilkins, Edwards, Sentelle